ROBERT S. SHWARTS (SBN 196803)
rshwarts@orrick.com
KRISHNA SHAH (SBN 336531)
krishna.shah@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| RENESAS ELECTRONICS CORPORATION; RENESAS ELECTRONICS AMERICA INC., | Case No. 5:26-cv-07573 |
|---|---|
| Plaintiffs, | **COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES FOR MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA (18 U.S.C. § 1836 ET SEQ.); BREACH OF CONTRACT; CONVERSION; VIOLATION OF CALIFORNIA PENAL CODE § 502(C); UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, ET SEQ.** |
| v. | |
| NAVITAS SEMICONDUCTOR USA, INC.; CHRISTOPHER ALLEXANDRE, an individual; FELICIA CHENG, an individual; and DOES 1-20, | |
| Defendants. | DEMAND FOR JURY TRIAL |

COMPLAINT

Plaintiffs Renesas Electronics Corporation ("Renesas") and Renesas Electronics America Inc. ("REA") bring this action against Defendants Navitas Semiconductor USA, Inc. ("Navitas"), Christopher Allexandre ("Allexandre"), Felicia Cheng ("Cheng"), and DOES 1 through 20, inclusive (collectively, the "Defendants"). Plaintiffs assert claims for: (1) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 et seq., (2) breach of contract, (3) conversion, (4) violation of California Penal Code §502(c), and (5) Unfair Competition under California Business and Professions Code § 17200, et seq. Plaintiffs seek remedies against Defendants including injunctive relief, compensatory and exemplary damages, disgorgement of compensation, and an award of Plaintiffs' reasonable attorneys' fees and costs. In support of their claims and requested relief, Plaintiffs allege as follows:

## I.      INTRODUCTION

1.      The semiconductor industry sits at the center of the modern artificial intelligence ("AI") economy. The chips at issue here are not incidental products—they are the critical components that power the rapidly expanding network of AI data centers upon which global technology companies now depend. As demand for AI infrastructure accelerates, so too does the competition among semiconductor companies to design, manufacture, and supply the next generation of high-performance power solutions.

2.      One of the most important—and competitive—frontiers in this race is gallium nitride ("GaN") technology. GaN-based chips are rapidly replacing traditional silicon in AI data centers because they operate at higher efficiency and can meet the increasing power demands of AI systems. The result is a fast-moving, high-stakes market in which speed, innovation, and proprietary know-how determine who wins and who is left behind.

3.      This case is about what happens when a competitor seeks to shortcut that innovation.

4.      Defendant Navitas Semiconductor USA, Inc. ("Navitas") did not develop its position in the GaN market through independent research alone. Instead, as detailed below, Navitas recruited away the REA employees responsible for Renesas's GaN business and, through them, obtained access to Renesas's most sensitive and confidential information.

- 1 -

5.     Christopher Allexandre, REA's former Senior Vice President and Head (General Manager) of its Power Division, left REA to become Navitas's Chief Executive Officer. Shortly thereafter, other REA employees followed, including Felicia Cheng, Renesas's former Director of Quality Assurance, who joined Navitas as its Vice President of Quality. While employees are generally free to change jobs—even to competitors—they are not free to take their former employer's trade secrets with them.

6.     That is precisely what occurred here.

7.     Upon their departure, these former employees took highly confidential Renesas materials, including detailed product specifications, schematics, cost structures, and supply chain and manufacturing information—highly valuable information that Renesas and REA take substantial measures to protect.

8.     Armed with this information, Navitas was able to accelerate its competitive position. Within a short period of time after Allexandre assumed the role of CEO, Navitas announced a new "2.0" strategy that directly mirrored Renesas's confidential plans—targeting the same customers, the same technologies, and the same market opportunities reflected in the stolen materials.

9.     This was not coincidence. It was misappropriation.

## II.     PARTIES

10.     Plaintiff Renesas Electronics Corporation ("Renesas") is a Japan corporation with its principal place of business at Toyosu Foresia, 3-2-24 Toyosu, Koto-ku, Tokyo 135-0061, Japan.

11.     Plaintiff Renesas Electronics America Inc. ("REA") is a California corporation with its principal place of business at 6024 Silver Creek Valley Road, San Jose, CA 95138. REA is a wholly owned subsidiary of Renesas.

12.     Defendant Navitas Semiconductor USA, Inc. ("Navitas") is a Delaware corporation with its headquarters at 3520 Challenger St, Torrance, CA 90503.

13.     Defendant Christopher Allexandre ("Allexandre") is an individual residing in California. Allexandre was formerly employed as the Senior Vice President and Head (General

Manager) of the Power Division at Plaintiff REA. Allexandre is now President and Chief Executive Officer at Defendant Navitas.

14.    Defendant Felicia Cheng ("Cheng") is an individual residing in California. Cheng was formerly employed as the Director of Quality Assurance at REA. Cheng is now Vice President of Quality at Defendant Navitas.

### III.    JURISDICTION

15.    This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and the trade secret laws of the United States, 18 U.S.C. § 1836 and 1839 *et seq.*, and the Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because Plaintiffs' federal and state law claims derive from a common nucleus of operative fact.

16.    This Court has general personal jurisdiction over the Defendants because, at all relevant times, the Defendants were domiciled in California, and thus are citizens of California.

17.    This Court has specific personal jurisdiction over the Defendants, because all of the Defendants intentionally and purposefully misappropriated, used, and/or disclosed Renesas and REA's trade secret information, and Defendant Allexandre breached his contracts with REA in or around San Jose, California.

### IV.    VENUE

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this lawsuit and a substantial injury to Plaintiffs have occurred in this district in Santa Clara County, California.

### V.    FACTUAL ALLEGATIONS

**A.    AI Is Driving The Global GaN Market**

19.    With artificial intelligence (AI) datacenters cropping up globally, the rise of AI and its groundbreaking capacity to organize data comes with unprecedented new demands for power.

20.    These projected energy needs are staggering. In the U.S. alone, data center power usage is projected to reach 130 gigawatts by 2028, requiring up to 12% of total U.S. electricity

generation.[1]

21.     The chips capable of withstanding these power demands are not the traditional silicon semiconductors of yore which manage, convert, and regulate power for individual devices such as PCs, electronic vehicle batteries, and electronic medical imaging machines. Instead, these new chips utilize gallium nitride (GaN) technology: an emerging wide-bandgap semiconductor technology that is revolutionizing power electronics.

22.     GaN enables higher switching frequency, lower power losses, and smaller form factors. These benefits create greater efficiency, lighter and smaller composition, and lower overall costs.

23.     GaN achieves these remarkable improvements because it conducts electrons several times faster than traditional silicon, making it more compact, efficient, and cooler. Whereas traditional silicon semiconductors are approaching capacity, GaN chips can power AI data centers by mitigating copper overload and reducing energy conversion losses. As a result, GaN maintains structural integrity and top performance even when operating at far higher maximum temperatures than silicon can safely handle, making it ideal for high-power and/or high-temperature applications such as for use in AI datacenters.

24.     Enter global semiconductor companies vying to supply those AI datacenter power needs with GaN chips. In January 2025 alone, Amazon, Meta, Microsoft, Nvidia and Oracle inked deals worth approximately $676 billion[2] requiring billions of dollars' worth of power solutions that semiconductor companies like Renesas, Navitas, Wolfspeed, Texas Instruments, Infineon Technologies, and NXP Semiconductors fulfill.

25.     The global semiconductor industry is an estimated $1 trillion market, and the GaN market is a growing piece of that (growing) pie. In 2024, the global GaN market was approximately $355 million.[3] By 2030—less than four years from now—that number is expected to grow to $3 billion.[4] Navitas's own estimate of the market is even more generous, valuing it at

---

[1] https://www.energy.gov/articles/doe-releases-new-report-evaluating-increase-electricity-demand-data-centers
[2] https://www.crn.com/news/data-center/2025/aws-meta-microsoft-nvidia-and-oracle-five-data-center-deals-worth-676b-announced-this-month?page=2&itc=refresh
[3] https://www.yolegroup.com/press-release/from-chargers-to-data-centers-power-gan-market-set-for-rapid-sixfold-expansion-by-2030/
[4] *Id.*

$3.5 billion in 2030.[5]

26.    The AI race has created a parallel GaN race among global semiconductor companies to provide GaN-based power solutions to secure multi-million and billion-dollar contracts.

**B.    Renesas: The Global Standard Among Semiconductor Companies**

27.    Renesas Electronics Corporation ("Renesas"), established in 2002 in Japan, is a leading global supplier of embedded semiconductor solutions, specializing in microcontrollers (MCUs), system-on-chips (SoCs), analog, power, and connectivity devices used in automotive, industrial, infrastructure, and IoT applications enabling billions of connected intelligent devices. Renesas also offers robust ecosystem support for its customers by offering a broad product portfolio, including High Performance Computing, Embedded Processing, Analog & Connectivity, and Power products, a variety of software, boards, and simulation and design tools.

28.    Renesas Electronics America Inc. ("REA"), founded in 2010 and headquartered in Santa Clara, is a wholly owned subsidiary of Renesas and runs Renesas's US-based operations.

29.    Over the last two-and-a-half decades, Renesas has grown to more than 21,000 employees in more than 36 locations in more than 30 countries. Last year, Renesas's global 2025 annual revenue was ¥1.32 trillion or approximately $8.8 billion.

30.    In recent years, Renesas has established itself as a key innovator in the power market by developing semiconductors that increase power efficiency in the automotive, infrastructure, industrial, and IoT markets. Renesas developed an industry-first complete memory interface chipset that integrates multiple functions to enhance power efficiency and reliability.

31.    As the role of the data center has become more vital to everyday life, Renesas is called upon to develop MCUs and power devices that protect client information against third-party hacking while supporting real-time, high-volume information products that contribute to life-saving products such as Advanced Driver Assistance Systems and automated parking.

32.    To maintain a competitive advantage, Renesas invests heavily to develop the next generation of MCUs and power devices. In fiscal years 2024 and 2025 alone, Renesas invested

---

[5] https://navitassemi.com/navitas-semiconductor-announces-fourth-quarterand-full-year-2025-financial-results/

approximately $1.4 billion in research and development.

33. Renesas prides itself on its both wide and deep patent and trade secret portfolio—a wealth of IP it heavily guards and regularly invests in to support its nearly annual $9 billion revenues.

34. Recognizing the strategic importance of GaN technology, Renesas greatly expanded its GaN offerings and expertise through the acquisition of Transphorm, Inc. ("Transphorm")—a high-power company specializing in the design and manufacture of high-voltage GaN power devices—in 2024 at a value of $339 million dollars.

35. In acquiring Transphorm, Renesas gained a deep GaN IP portfolio including four generations of GaN patents and trade secrets, and manufacturing facilities and capabilities.

36. Renesas acquired Transphorm to implement its auto-qualified GaN technology to develop new and enhanced power solution offerings, such as X-in-1 powertrain solutions for EVs (which are soon-to-be-released), along with computing, energy, industrial and consumer applications.

37. This acquisition paid off. On July 1, 2025, Renesas introduced three new high-voltage power supply systems, including the new 800 voltage HVDC architecture, to serve multi-kilowatt-class applications such as data centers. In fact, Renesas presently offers GaN product solutions in three of its four operating industries: (1) infrastructure, (2) industrial, and (3) IoT.

**C.     Renesas's Global Acclaim**

38. Renesas's excellence is recognized throughout the semiconductor industry and corporate America. Renesas has won Design News' Golden Mousetrap Award for Automotive Electronics and is a UBM Tech's EE Times and EDN Annual Creativity in Electronics (ACE) Awards finalist in the Ultimate Products – Power and Energy Technology categories.

39. Renesas's product innovation also leads the semiconductor and power product industry on a global stage. In 2024 alone, Renesas offerings won two Electronik Products of the Year Awards, two Product of the Year Awards at the Electronics Industry Awards, an Elektra Award for excellence in the automotive category, a World Electronics Achievement Award at the International Integrated Circuit Exhibition and Conference, and was named a TrustRadius

Buyer's Choice Award winner.

40.     Renesas's product excellence continually results in multi-million and multi-billion dollar contracts to provide embedded semiconductor solutions for the world's leading technology companies. For well over a decade, Renesas has been a premier supplier of embedded semiconductor solutions to the biggest companies in the world, including F500 and FAANG companies.

41.     F500 and FAANG leaders partner with Renesas to the tunes of multi-millions and billions because Renesas invests in and protects its IP to develop innovative solutions for its valued customers. Renesas has earned and kept the trust of the world's leading companies decade after decade.

**D.     Renesas's Competitor in GaN Products: Navitas Semiconductor**

42.     Navitas Semiconductor USA, Inc. ("Navitas"), founded in 2014 and headquartered in Torrance, CA, describes itself as a GaN, integrated devices ("IC"), and high voltage silicon carbide (SiC) technology company.

43.     But it hasn't always described itself that way. This recent shift to high-power sectors like AI data centers, electric vehicles, and grid infrastructure with GaN solutions and away from low-power consumer electronics like mobile phone chargers is the focal point of "Navitas 2.0", an organizational shift led by Allexandre, Navitas's now-President and CEO, and former Senior Vice President at Renesas.[6]

44.     Allexandre stated that the purpose of "Navitas 2.0 [is to] align the entire organization's focus on addressing high-power markets with our industry-leading GaN and high-voltage SiC solutions."[7] He notes his success in leading Navitas by achieving that goal, stating "[a]s evidence of our progress, high-power markets contributed a majority of revenue for the first time."[8]

45.     In the short time since Allexandre has led Navitas, Navitas has accomplished many feats in furtherance of its "2.0" goals. Navitas announced collaborations with Nvidia (also a key

---

[6] *See supra*, fn. 5
[7] *Id.*
[8] *Id.*

- 7 -

Renesas customer), GlobalFoundries, Cyient Semiconductors, WT Microelectronics and Avnet. Navitas has released several platforms (all-GaN 10 kW 800V–to–50V DC-DC platform, and 5th-generation GeneSiC™ technology platform), and accelerated sampling of GaN and SiC products (100V and new 650V GaN, 2300V and 3300V ultra-high voltage SiC).[9]

46.     On information and belief, Navitas has incorporated Renesas trade secrets in its business operations by actions by Allexandre and Cheng in the furtherance of the "Navitas 2.0" vision.

47.     In a remarkably short time, Navitas has become a sizeable player in the global semiconductor market. Various reports estimate that Navitas holds between 15% to 30% of the global power GaN market share.[10,11] Navitas claims that it supplies GaN power integrated circuits to all 10 of the top 10 global smartphone and laptop manufacturers.[12]

**E.     Where Renesas and Navitas Compete: GaN**

48.     Both Renesas and Navitas have a portfolio of low and high voltage GaN products, and currently compete in the 2030 $2.9 billion market. Competition in the 2030 market is ongoing because products are being developed now that will undergo various phases (e.g. sampling, design, manufacturing and release) throughout the upcoming years, which will ultimately vie for shares of the 2030 market.

49.     Renesas reported approximately $8.8 billion in 2025 revenue, which it earned with its vast product portfolio in which GaN is just one piece, worth tens of millions.

50.     In contrast, Navitas reported a total net revenue of $45.91 million in 2025, where Navitas's high-voltage GaN and SiC solutions contributed to a majority of that revenue.[13]

51.     Navitas's motive to play dirty and steal competitor trade secrets is clear: Success in the GaN market is existential for Navitas. It is not for Renesas.

---

[9] https://navitassemi.com/navitas-collaborates-with-nvidia-mgx-ecosystem-to-accelerate-800-vdc-ai-infrastructure/; *see supra*, fn.5
[10] https://www.electronicsweekly.com/news/business/navitas-leads-gan-power-devices-2021-10/
[11] https://www.trendforce.com/news/2025/11/27/news-globalfoundries-moves-on-gan-tsmc-and-navitas-ties-position-u-s-as-new-gan-production-hub/
[12] https://navitassemi.com/navitas-semiconductor-announces-fourth-quarter-and-full-year-2024-financial-results/
[13] *See supra*, n. 5

- 8 -

**F.      Navitas GaN Products Are Accused of Patent Infringement**

52.      This is not the first time Navitas has been alleged to incorporate a competitor's protected information into its GaN products to cheat and steal its way to the top.

53.      On July 7, Wolfspeed, Inc. ("Wolfspeed"), a North Carolina-based GaN and SiC semiconductor company filed suit against Navitas alleging that Navitas's GaN products, including GaNFast®, GaNSlim™, and GaNSafe® product families, and Navitas's SiC products, including GeneSiC™ MOSFETs and SiCPAK® Module products, infringe five Wolfspeed patents. *Wolfspeed, Inc. v. Navitas Semiconductor Corp. et al*, No. 1:26-cv-00818 (D. Del. July 7, 2026).

54.      These two occurrences of Navitas using competitor information or property rights without permission to further its GaN offerings, call into question Navitas's integrity, and the integrity of those that lead it, including its President and CEO, Chris Allexandre, and its Director of Quality, Felicia Cheng.

**G.      Christopher Allexandre, former Senior Vice President at Renesas**

**1.      Allexandre's Tenure at Renesas**

55.      Christopher Allexandre joined REA in April 2019 as a Senior Vice President when he signed his March 29, 2019 Employment Agreement ("Allexandre Employment Agreement"), Ex. A. The Allexandre Employment Agreement required Allexandre to maintain the confidentiality of Renesas's confidential information during and after the termination of his employment ("As a condition of employment, you agree to sign and abide by the terms of REA's Employee Confidentiality and Invention Assignment Agreement", § 11), and prohibited Allexandre from, "solicit[ing] or attempt[ing] to solicit any employee, consultant, or independent contractor of [REA] or any of its affiliates to terminate his or her employment or other relationship with [REA] or any of its affiliates" during his employment with Renesas (§ 12).

56.      As referenced in the Allexandre Employment Agreement, Allexandre also signed an Employee Confidentiality and Invention Assignment Agreement ("Allexandre Confidentiality Agreement"), under which he similarly agreed to (i) keep Renesas information confidential (§ 3), (ii) not assist Renesas competitors such as Navitas during his employment at Renesas (§ 5), and

- 9 -
COMPLAINT

(iii) not solicit Renesas employees to terminate their employment with Renesas while he was employed by REA (§ 6). Ex. B.

57. Per the Allexandre Confidentiality Agreement, Allexandre agreed that "[a]t all times, both during my employment and after its termination; *I shall keep and hold all Confidential Information in strict confidence and trust*, and ensur[e] that all appropriate confidentiality precautions are observed (e.g., nondisclosure agreements are executed and documents are properly labeled as being confidential). *I shall not use any Confidential Information except as permitted and only in the performance of my duties as an employee of the Company*. I shall not disclose Confidential Information to others, or lecture upon or publish such information, except as permitted by express written approval from the Company." § 3.2.

58. Allexandre also agreed to return all Renesas property when leaving REA. *Id.*, § 3.4 ("Return of Company Property. When I leave the employ of the Company, I will deliver to the Company any and all drawings, notebooks, notes, memoranda, source code, memory storage devices, specifications, other hardware and software and devices, formulas, records, manuals, reports, and documents, together with all copies thereof (physical, electronic, or otherwise), and any other material containing or disclosing any Company Inventions, Third Party Information, or Confidential Information of the Company, that is within my possession, custody, or control. Further, *upon termination of employment I also will return any and all other Company property or equipment in my possession, custody, or control*.").

59. He agreed that "my employment with the Company requires my undivided professional attention and effort…. *I shall not…assist in any manner any business which directly or indirectly competes, with the business or future business plans of the Company*." *Id.*, § 5.

60. Allexandre further promised that "At all times while I am employed by the Company…I shall not, directly or indirectly, for myself or for any other person, firm, corporation, partnership, association, or other entity call on, induce, or solicit any employee, former employee, or consultant of or to the Company…." *Id.*, § 6.

61. Based on the confidence Renesas placed in Allexandre's leadership, Allexandre

- 10 -

was promoted through a series of increasingly senior executive roles. In July 2022, he became Senior Vice President, Head of Sales and Corporate Digital Marketing. In January 2023, he was promoted to Senior Vice President, Chief Sales and Marketing Officer and Head of the Global Sales and Marketing Unit. On January 1, 2024, Allexandre assumed his highest-ranking position with Renesas as Senior Vice President and General Manager of the Power Business reporting directly to the President and Chief Executive Officer of Renesas.

62.    As Senior Vice President and General Manager of the Power Business, Allexandre was responsible for overseeing Renesas's power management and discrete products, and executing Renesas's global Power strategy. Among his responsibilities, Allexandre led Renesas's GaN Business Division where he was responsible for developing and executing Renesas's strategic vision for its GaN business.

63.    Following Renesas's acquisition of Transphorm in June 2024, Transphorm's GaN products were integrated into Renesas's Power product portfolio. Allexandre assumed responsibility for leading the combined GaN product line and directing its strategic integration into the company's broader Power business.

64.    In this role, Allexandre was entrusted with developing and implementing Renesas's highly confidential GaN strategy—a multi-year plan designed to expand Renesas's leadership in the rapidly growing GaN market by leveraging Renesas's unique technology portfolio, integrated product ecosystem, customer relationships, manufacturing capabilities, and future product roadmap.

65.    With each successive promotion, Allexandre was entrusted with broader strategic responsibilities and greater access to Renesas's most valuable confidential, proprietary, and trade secret information.

66.    By virtue of his senior executive positions, Allexandre owed fiduciary duties to Renesas and REA, including duties of loyalty, good faith, and full disclosure, and was obligated to act in the best interest of Renesas and REA at all times and to protect and safeguard Renesas's confidential and proprietary information.

- 11 -

**2.    Allexandre's Departure from Renesas**

67.    After six-and-a-half years at Renesas, Allexandre gave notice of his intent to leave REA in late 2024 or early 2025.

68.    When Allexandre left REA in June 2025, he did so on very friendly terms and with a sizeable severance package in hand including significant cash compensation, reflecting the amicable nature of his departure. Allexandre was celebrated with a grand farewell dinner attended by members of Renesas and REA senior executives. Renesas's President and Chief Executive Officer sent an email to all employees announcing Allexandre's departure and expressing appreciation for his contributions during his tenure. As a part of his forthcoming separation, in May 2025, REA and Allexandre executed a Confidential Separation Agreement and General Release ("Separation Agreement"). Ex. C.

69.    The Separation Agreement contained a confidentiality provision (§ 2) which stipulated that

> Employee acknowledges that, as part of Employee's employment, Employee had access to information of a nature not generally disclosed to the public, and ***Employee agrees to keep confidential and not disclose to anyone Company's business, proprietary, and trade secret information in Employee's possession***, or any personal, confidential, or otherwise proprietary information regarding Company's employees, customers, and clients, or Company's personnel practices and related matters. This obligation is understood to be in addition to, and not as any replacement for, any agreements Employee may have signed with the Company concerning confidentiality, trade secrets, non-disclosure, or assignment of inventions or other intellectual property developments, including the Employment Agreement, which agreements will remain in full force and effect. Employee agrees that ***Employee will not take, copy, use, or distribute in any form or manner documents or information that Company deems proprietary***, including without limitation research and development materials, information regarding customers, clients, business partners, or prospective customers, clients, or business partners, financial information, business and strategic plans, software programs and codes, access codes, and other similar materials or information.

70.    The Separation Agreement provided that "Employee agrees Employee will not act in any manner that might damage the business of Company." § 8.

71.    Under the Separation Agreement, Allexandre also "agree[d] to cooperate in good faith and to do all things necessary to effectuate this Agreement." § 17.

72.    The Separation Agreement further provided that "[i]n the event that Employee

- 12 -

breaches any of Employee's obligations under this Agreement…Employee agrees that the Company may cease making any payments due under this Agreement, and recover all payments already made under this Agreement, in addition to all other available legal remedies." § 10. In other words, the Separation Agreement provided that if Allexandre breached any of the foregoing provisions, REA can claw back all severance payments, in addition to filing suit.

73.    On June 30, 2025, REA and Allexandre executed his Final Release of Claims ("Final Release"). Ex. D.

74.    In the Final Release, Allexandre "agree[d] to **return to Company any and all Company property in Employee's possession, including** without limitation any electronic devices; computers or laptops; software programs; other Company equipment, tools, **records, or technical materials; information related to Company customers, clients and business contacts**; marketing information; pricing information; cellular phones; personnel materials or files, handbooks, manuals, or policies; memoranda, notes, and drafts thereof; **and any other documents** or property (and any summaries or copies thereof), developed by Employee and/or obtained by Employee or on Employee's behalf, directly or indirectly, pursuant to Employee's employment with Company." § 2.

### 3.    Allexandre Stole Renesas's Confidential Information and Trade Secrets

75.    During his employment at REA, Allexandre used a MacBook laptop to perform his job duties. When he departed REA, REA wiped the MacBook of REA files and information after which Allexandre was permitted to retain the MacBook. However, because Allexandre was identified in an unrelated litigation matter before his departure, REA backed up, *i.e.* replicated the contents of, the MacBook laptop and preserved this backup for the unrelated matter before conducting the wipe.

76.    Renesas provided the backup of Allexandre's laptop to an independent third-party forensic vendor for analysis. The investigation revealed that in the eight days before Allexandre's departure, he downloaded at least four files to at least two external USB drives, including two dense PowerPoint presentations which include business-critical Renesas trade secrets.

- 13 -

77. One PowerPoint Allexandre stole via USB drive, entitled "PWR Technology For Datacenters: High Voltage Architecture In Datacenters," is a 29-slide presentation that includes highly business-critical Renesas trade secrets that reflect forward-looking product roadmaps and Renesas product specifications .

78. This presentation gives the game away:

- This presentation reveals how Renesas technologically matches particular customer specifications for two of Renesas's largest customers. These customers are two for which Renesas directly competes against Navitas. This information is also among the most sensitive information that exists at Renesas.

- ***The presentation contains Renesas's 2-3 year top-secret Roadmap*** revealing the current products in production, the next phase of products that will be produced and hit the market in 1-2 years, and the third phase of products that will hit the market in 2-3 years. ***This product information includes Renesas product specifications.*** None of this information is public or even revealed to Renesas customers. This Roadmap of Renesas products is among the most sensitive internal information that exists at Renesas.

79. This presentation was located on a highly restricted internal SharePoint site, where only 20-25 Renesas employees out of more than 21,000 could access the presentation. Within the Power Division, only the leadership team could access the presentation.

80. The second mission-critical PowerPoint that Allexandre took is entitled "GaN for Infrastructure," a 24-slide presentation including highly business-critical Renesas trade secrets.

- ***This presentation also contains Renesas's 2-3 year top-secret Roadmap*** revealing the current products in production, the next phase of products that will be produced and hit the market in 1-2 years, and the third phase of products that will hit the market in 2-3 years. ***This product information includes Renesas specifications.*** None of this information is public or even

- 14 -

revealed to customers. This Roadmap of Renesas products is among the most sensitive internal information that exists at Renesas.

- One slide in this presentation alone reveals ***Renesas's secret internal cost structures*** (to which zero customers or competitors are privy), including prices per piece needed to assemble a final product, and information on how to build the product.

- Several slides discuss Renesas's operational challenges that competitors could use out of context to harm Renesas's reputation with AI customers responsible for billions in contracts.

81.     These are hardly exhaustive lists: both presentations are rife with other Renesas confidential information and trade secrets.

82.     None of this information is public (and each slide in both presentations bears a red stamp that the slide is "Renesas Confidential" information). The vast majority of this information has not even been revealed to Renesas's customers, with only a small fraction revealed to customers under strict non-disclosure and confidentiality agreements.

83.     Any Renesas competitor (like Navitas) could use the information in these presentations to engineer the same secret product specifications Renesas has designed, knowing Renesas's timelines, to beat Renesas to market to steal billion-dollar contracts.

### 4.     Allexandre Solicited Renesas Employees To Work At Navitas While Serving As Renesas's Senior Vice President

84.     The forensic investigation also revealed that Allexandre solicited REA employees to join him at his prospective future employer at Navitas while he was still employed as a Senior Vice President at REA.

85.     Exactly one month before Allexandre left REA, on May 30, 2025 he texted then-Renesas Senior Vice President and General Manager of the Embedded Processing and Analog & Connectivity Division, Davin Lee, saying "Come join me soon" and "Or I take you on the board." Davin Lee left REA a few months later on December 31, 2025. On May 4, 2026, Navitas announced that Davin Lee had joined its Board.

- 15 -

86.    That same day, May 30, 2025, Scott Martin emailed Allexandre his resume writing "Here is my resume." Two weeks later, Scott Martin emailed Allexandre attaching an updated resume and writing "Here is a revised version. Thank you for the feedback. I emphasized the SCM and planning tools more." Scott Martin served as REA's Vice President of Operations, Product Development for nearly seven years. He left REA for Navitas in November 2025, where he now serves as the Senior Vice President of Operations.

### 5.    Allexandre Joined Navitas as its President, CEO, and Board Member

87.    In September 2025, Navitas publicly announced that Allexandre had joined Navitas as its President, CEO, and Board Member, touting his "over two decades of global leadership" including that he "served as Senior Vice President and General Manager of Power Division at Renesas, overseeing the company's power management and discrete product lines ($2.5B revenue). Prior to that, he was Chief Sales & Marketing Officer, leading Renesas's global sales and marketing transformation."[14]

88.    Although Navitas was traditionally known for mobile and consumer electronics, Allexandre notes that under his leadership, "Navitas 2.0" is "strategic[ally] repositioning" towards power products, and specifically "high-power GaN and SiC technologies in AI data centers, energy and grid infrastructure, performance computing and industrial electrification."[15] This is because Allexandre is "increasingly seeing AI as a catalyst that is driving momentum and broadening adoption of high-power solutions across all of our target end markets."[16] All of these technologies and concepts at the center Allexandre's "Navitas 2.0" are the subject of the two PowerPoint presentations that Allexandre secretly stole from Renesas on a USB drive in the days before leaving REA to go lead Navitas.

89.    In line with Allexandre's "Navitas 2.0" vision, on June 3, 2026, Navitas announced a collaboration with Nvidia[17] wherein Navitas features the same technology that was the subject of the two PowerPoint presentations that Allexandre secretly stole from Renesas.

---

[14] https://navitassemi.com/team/chris-allexandre-nvts/
[15] https://navitassemi.com/navitas-semiconductor-announces-fourth-quarterand-full-year-2025-financial-results/
[16] *Id.*
[17] https://navitassemi.com/navitas-collaborates-with-nvidia-mgx-ecosystem-to-accelerate-800-vdc-ai-infrastructure/

**H.    Felicia Cheng, Former Director at Renesas**

**1.    Cheng's Tenure at Renesas**

90.    Cheng joined Elantec Semiconductors Inc. in September 1999. After Intersil Corp. acquired Elantec Semiconductor in May 2002, Cheng continued to work at Intersil. Renesas acquired Intersil in February 2017, at which point Cheng became an REA employee. Cheng continued to work at REA thereafter for the next nine years until her resignation in March 2026.

91.    Beginning January 2022, Cheng served as REA's Quality Assurance Director, where she led the strategic quality organization supporting the company's key global customers. In that role, Cheng served as the primary quality interface between REA and its most important customer accounts, managed a worldwide team of Customer Quality Engineers, and was responsible for leading customer quality engagements, executive-level business reviews, quality escalations, and strategic quality initiatives across Renesas's advanced semiconductor technologies.

92.    To perform these responsibilities, Cheng was entrusted with extensive access to Renesas's confidential, proprietary, and trade secret information, including information relating to product quality, engineering analyses, manufacturing processes, product reliability, customer strategies, and other sensitive business information. Cheng also routinely received and accessed confidential information belonging to Renesas's customers, including product specifications, technical requirements, quality data, field performance information, and other information that customers entrusted to Renesas with the expectation that it would remain confidential.

93.    On April 20, 2023, Cheng acknowledged that she had received, read, understood, and agreed to comply with the Renesas Global Code of Business Conduct (the "Code of Conduct"). The Code of Conduct provides that protecting Renesas's confidential, proprietary, and trade secret information—as well as confidential information entrusted to Renesas by its customers—is a fundamental obligation of every employee.

94.    Among other things, the Code of Conduct instructs employees not to disclose Renesas's confidential, operational, trade secret, or other business information except as authorized; to protect the confidentiality of customer information entrusted to the company; to

- 17 -

share confidential information only on a need-to-know basis; and to avoid using personal accounts or personal devices for company business. The Code of Conduct further requires employees to safeguard Renesas assets and information, prevent the unauthorized disclosure or misuse of confidential information, and exercise care before transmitting emails containing confidential information.

95.    The Code of Conduct also specifically provides that customers, suppliers, and other business partners entrust Renesas with confidential information and that every employee is responsible for protecting and maintaining the confidentiality of that third-party information.

### 2.    Cheng's Changing Responsibilities

96.    In her time as the Director of Quality Assurance, Cheng worked with and interfaced with several Renesas customers including Nvidia, an AI customer, among others.

97.    In order to meet production deadlines and ensure quality control on a specific project involving a key customer ("Customer X"), REA directed Cheng to transition away from work she was performing for other Renesas customers and devote her efforts exclusively to the Customer X project.

98.    To that end, on February 24, 2026, Cheng's supervisor informed her, in writing, that moving forward, Cheng was no longer assigned to any work for Nvidia, and instead her efforts would be exclusively dedicated to the Customer X project. She confirmed, in writing, her understanding of the change in her job duties.

### 3.    Cheng's Resignation and Clandestine Unsanctioned Meeting with Nvidia

99.    On March 2, 2026, Cheng verbally provided her resignation to her direct supervisor, Stephen Lazuardi ("Lazuardi").

100.    On March 5, 2026, Cheng attended an in-person meeting at Nvidia, a key joint customer of Renesas and Navitas, even though she had no responsibility for Nvidia at that time. Cheng attended this meeting without the knowledge of or permission from her supervisor, Lazuardi. By attending this meeting, Cheng chose to prioritize meeting in person with a customer account outside of her assigned responsibilities, over performing her work for Customer X.

- 18 -

COMPLAINT

During the meeting, without the knowledge or approval of REA's Human Resources or the internal Renesas-Nvidia team, Cheng informed the Nvidia attendees that she was resigning from Renesas.

101.    On March 6, 2026 at approximately 11 am, Cheng met with her supervisor Lazuardi, where she disclosed that she accepted a job offer at Navitas.

102.    At this meeting, Cheng also disclosed that she had attended the Nvidia meeting in person the prior day and informed Nvidia of her resignation. When asked why she attended the meeting despite her not having responsibilities for Nvidia, she gave no response.

103.    During the meeting, Cheng also expressed her intent and desire to inform other Renesas F500 clients of her departure. Lazuardi advised Cheng that she was not authorized to communicate her resignation to any other customers, and that any communications regarding her departure would be coordinated and handled by REA.

104.    Consistent with REA's standard practice, departing employees do not communicate their resignation directly to customers. Instead, REA first identifies an appropriate replacement for customer-interfacing employees such as Cheng, and then coordinates communications with the customer, including introducing a replacement employee to help continuity of service, support, and expertise. Cheng's unsanctioned race to inform Nvidia she was leaving Renesas undermined REA's usual customer care plan.

**4.    Cheng Stole Renesas's Trade Secrets and Confidential Information**

105.    A forensic examination by a third-party vendor of Cheng's REA-issued computer revealed that in Cheng's final days at REA, she sent three highly confidential Renesas email threads including two highly confidential Renesas PowerPoint presentations from her Renesas email account to her personal Gmail account.

106.    These stolen materials include Renesas confidential information and trade secrets about, *inter alia*:

- Renesas's supply chain, including its manufacturing subcontractors and Renesas's analyses of their capabilities, facility locations by product, and other critical information about the locations and capacity of Renesas manufacturing

- 19 -

that competitors could use to undercut Renesas in the current market where AI-driven demand far supersedes manufacturing capacity.

- Renesas testing data for its products that provides Renesas's internal cost structures from which customers and competitors can derive Renesas's cost margins; numbers of parts; and testing challenges from which competitors could bypass the testing and innovation Renesas has spent time and money on to undercut Renesas's price in the market.

- Several slides analyzing Renesas's operational challenges (including with quantifications) with AI customers, which could be maliciously weaponized—especially out of context, if not provided with Renesas's accompanying proposed solutions and action plan for growth—to damage Renesas's reputation with its AI customers who are responsible for billions of dollars of contracts with Renesas.

107. Again, this is not an exhaustive list. The emails and presentations Cheng stole are rife with other Renesas confidential information and trade secrets, and represent months of analysis, meetings, and work.

108. None of this information is public (and each slide in both presentations bears a red stamp that the slide is "Renesas Confidential" information). This information has not even been revealed to Renesas's customers, let alone its competitors.

**I.    Cheng joins Navitas as Vice President of Quality**

109. Very soon after she left her role as Director of Quality Assurance at REA, Cheng began working as Vice President of Quality at Navitas.

110. On information and belief, at Navitas, Cheng furthers' the Navitas 2.0 vision by contributing to its GaN product lines.

**J.    Renesas's Efforts to Protect its Confidential Information and Trade Secrets**

111. Renesas has spent tens of billions of dollars and millions of man-hours over two-and-a-half decades developing its proprietary innovative products, schematics, processes, and technical expertise over the course of decades. Because of these investments, Renesas and REA

- 20 -

take extensive legal, technological, and operational steps to ensure that Renesas confidential information remains confidential.

112. At the outset, employees are only granted access to certain business information based on a business need. This is achieved through the use of restricted shared drives and document repositories. One example of this restriction among many is Renesas's use of restricted SharePoint sites. It is commonplace that information related to a certain project or certain customer is located on a unique SharePoint, and only those employees working on that project or for that customer are granted access to that SharePoint site. Access to certain individual documents is even further restricted to a need-to-know list when necessary to preserve their sensitivity.

113. Another way Renesas protects its confidential information is through numerous confidentiality agreements and employee policies.

114. First, Renesas and REA ensure that every employee signs at minimum one confidentiality agreement. As discussed above, *see supra* ¶¶ 55-58, 68-74, Allexandre signed at least four separate agreements over the course of his six-and-a-half-year tenure at REA wherein he agreed to maintain the confidentiality of Renesas's confidential information.

115. By signing the various confidentiality agreements, employees indicate their understanding that their access to confidential information is conditioned upon the satisfaction of the terms in the various agreements and that violation of those terms could result in Renesas and REA seeking legal or equitable remedies against them.

116. This requirement to keep Renesas information confidential is reflected in numerous other Renesas and REA policies and guidelines, which each employee is required to read and adhere to.

117. Allexandre's and Cheng's obligations to safeguard Renesas's confidential information was repeated to them in many places within REA's policies governing employee conduct.

118. For example, REA's PB2-03 - Protection & Inspection of Employee and Company Information Policy instructs that "Employees are responsible for safeguarding Company property

that has been assigned to them."

119.    As a part of the onboarding process, all new REA employees are required to complete the Code of Conduct training, including the Privacy and Information Security module. Thereafter, employees are required to complete annual Code of Conduct training, which reinforces their ongoing obligations to protect Renesas's and its customers' confidential information. Among other things, the Privacy and Information Security module instructs employees: "Use company information as needed for company business only. Don't send personal, confidential, or otherwise sensitive information by unsecured methods like e-mail or SMS."

120.    In addition to its onboarding and annual Code of Conduct training, REA distributes a Code of Conduct newsletter to employees approximately every two months. The newsletter reinforces employees' obligations under the Code of Conduct, and regularly addresses topics relating to ethics and compliance, including the importance of protecting Renesas's confidential and proprietary information and the confidential information entrusted to Renesas by its customers. For example, the newsletters entitled "Responsible Use of Social Media" and "Insider Trading Awareness" disseminated to all employees, including Allexandre and Cheng, prohibited disclosure of confidential information (including "[c]onfidential business strategies, financial plans, unreleased product information, or any other confidential information related to Renesas or its clients, suppliers, partners, and any other third parties") to third parties including on social media and for improper uses such as for insider trading.

121.    Another front-line defense for Renesas and REA to protect their confidential information is the unique identification of people who access the information. Each person who is granted access to confidential information is assigned a unique identifier that serves to authenticate and log all transactions initiated. Each such identifier is intended for the exclusive use of a specific individual, and employees are instructed never to share their passwords with anyone. Renesas and REA use the unique identifiers as part of their monitoring of computer systems handling confidential information. Employees are warned that their activity can be monitored.

COMPLAINT

122. Because Renesas and REA monitor many aspects of employees' activities on their computer systems, other policies also address the matter and warn employees that they have no expectation of privacy with respect to their use of Renesas's and REA's technology resources. For example, PB2-03 - Protection & Inspection of Employee and Company Information Policy which "applies to all U.S.-based employees" provides "the Company reserves the right to inspect and/or search any and all property on Company premises at any time with or without notice. Employees should have no expectation of privacy in any Company property. . . Employees should be aware that they have no right of privacy as to any information or file maintained in or on REA' property or transmitted to REA."

123. The "Basic Rules for IT Security" policy similarly provides that "The Information Security team can inspect when appropriate the files, messages, and data created, accumulated, or processed by employees by using the information systems of the company without prior notification at any time, in order to investigate and take required measures for preventing and correcting violations of the relevant rules defined by the Renesas group companies…." This policy also warns that "Employees who violate these regulations may be subject to sanctions and/or disciplinary actions in accordance with the applicable statutory and contractual provisions."

124. Renesas and REA employ additional strategies and procedures to prevent employees from taking Renesas confidential information off of Renesas's and REA's property and systems.

125. A key strategy Renesas and REA employs is multifactor authentication ("MFA") on Renesas and REA systems and devices as a part of their information security program, requiring multiple credentials to verify an employee's identity before they can access Renesas/REA systems and confidential information. MFA is required for access to Renesas/REA accounts and systems in order to protect the confidentiality, integrity, and security of Renesas's information. MFA ensures that even if login information is hacked or shared, unauthorized users cannot access Renesas/REA systems.

126. Another such strategy is technologically blocking the use of USB drives on REA

- 23 -

issued laptops, such that USB drives can only be used with a technological override granted only with approval from REA's IT department. The "Basic Rules for IT" policy provides that "In order to prevent information on removable storage such as USB memory being taken off company premises, write access from personal computers used by employees shall in principle be prohibited." The block prevents a key means for employees to transfer Renesas information off their REA device and onto a personal device. This block also prevents strangers from quickly downloading Renesas files if they were to somehow gain access to unattended REA devices.

127. Another internal procedure in this vein aims to prevent departing employees from taking Renesas confidential information with them when they leave. When a departing employee provides notice of their intent to leave Renesas or REA, they are customarily asked if they are joining a Renesas key competitor. If they are truthful in their response and admit to accepting a job offer from a competitor, REA will place them on a "garden leave." This means that REA will continue to pay the departing employee during their two-week notice period, but will not allow them to continue working or accessing Renesas systems and confidential information.

128. As part of REA's separation process, departing employees are asked to review, sign, and acknowledge a Debriefing Memorandum. This memorandum reminds employees that their obligation to maintain the confidentiality of Renesas's confidential information, as well as the confidential information of third parties entrusted to Renesas, continues after their employment ends. It further reinforces that employees may not retain, use, or disclose such confidential information following their separation from REA except as authorized by REA or otherwise permitted by law.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE
### Misappropriation of Trade Secrets under the DTSA, 18 U.S.C. § 1836 et seq.
**(Against All Defendants)**

129. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

130. Defendants misappropriated Renesas trade secrets under the Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1836 et seq.

131. Plaintiffs had the right to exclusively use and direct the use of Renesas confidential

information. Defendants engaged in misappropriation of trade secrets by acquiring, using and disclosing confidential, proprietary, and trade secret information of Renesas without authorization.

132.    Renesas invested and continues to invest substantial resources in developing proprietary GaN technology. Information Renesas has developed includes but is not limited to: Renesas's supply chain, including its manufacturing subcontractors and Renesas's analyses of their capabilities, facility locations by product, and other critical information about the locations and capacity of Renesas manufacturing; testing data for its products that provides Renesas's internal cost structures from which customers and competitors can derive Renesas's cost margins, numbers of parts, and testing challenges; PowerPoint slides that analyze Renesas's operational challenges; proprietary power-product architecture and roadmaps; Renesas schematics that meet client specifications; and internal product development and production deadlines.

133.    Because Renesas's products and client information are crucial to its success, Plaintiffs make substantial efforts to keep this information confidential from competitors. Plaintiffs require employees to keep this information confidential and to return all confidential information at the end of their employment.

134.    Plaintiffs take, and at all times here relevant have taken, reasonable efforts to maintain the secrecy of this Renesas confidential information they has developed: all Renesas and REA employees are provided with confidential information security policies and informed that their continued employment depends on their compliance with the requirements described in the policy; all employees are required to sign non-disclosure or confidentiality agreements; access to confidential information is restricted to employees who are determined to have a business need for such access; Plaintiffs' policies restrict access, use, copying, dissemination, and destruction of confidential information; Renesas's confidential information resides on secure, encrypted servers; access to Plaintiffs' computer networks is password protected; people who access confidential information are given a unique identifier that allows Plaintiffs to log all transactions initiated using that identifier. Plaintiffs further ensure their information is protected when shared with third parties through restrictive nondisclosure agreements.

- 25 -

COMPLAINT

135. The efforts Plaintiffs take to keep the above-listed information are reasonable under the circumstances to maintain the information's secrecy. Plaintiffs take these measures to ensure the confidentiality of this information because this information derives independent economic value and is not generally known to the public or to other persons who can obtain economic value from its disclosure or use. Renesas's competitors, like Navitas, in turn, would obtain economic value from the disclosure or use of Renesas's information, particularly as it relates to its high-voltage power product architecture and client information. Accordingly, the above-described information constitutes "trade secrets" under the Defend Trade Secret Act, 18 U.S.C § 1839(3).

136. In their respective roles as Senior Vice President and Director of Quality Assurance, Allexandre and Cheng acquired knowledge and custody of Renesas trade secrets. Allexandre and Cheng knew or had reason to know that their knowledge of Renesas's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of those trade secrets or limit their use.

137. Allexandre misappropriated Renesas's trade secrets, including proprietary power-product architecture and roadmaps, Renesas schematics that meet client specifications, and internal product development and production deadlines by, *inter alia*, secretly taking these trade secrets, including as contained within the two PowerPoints he downloaded onto USB drives, failing to return such information to REA at the end of his employment in breach of his duty to maintain secrecy, and, on information and belief, using Renesas's confidential and proprietary product architecture and plans including for an 800v power product to help Navitas develop a similar product months later.

138. Cheng has misappropriated Renesas's trade secrets, including detailed information about Renesas's manufacturing supply chain; Renesas testing data which provides Renesas's internal cost structures from which customers and competitors can derive Renesas's cost margins, numbers of parts, and testing challenges; and analysis of Renesas's operational challenges, *inter alia*, by emailing to her personal Gmail account, Renesas's trade secrets as contained within two emails and two attached PowerPoint presentations, failing to return such information to REA at

the end of her employment in breach of her duty to maintain secrecy, and, on information and belief, using Renesas's confidential information while subsequently at Navitas.

139. On information and belief, Navitas misappropriated Renesas's trade secrets, including those contained within the materials misappropriated by Allexandre and Cheng, by using those trade secrets in furtherance of its "Navitas 2.0" plan that centers around developing and producing the same technology (high-voltage GaN power product) for Renesas's client, Nvidia, that is the subject of the information misappropriated by Allexandre and Cheng.

140. Defendants have misappropriated the above-described trade secrets by acquiring, disclosing and/or utilizing said trade secrets in developing its own high-voltage power products.

141. As a direct, foreseeable and proximate result of Defendants' actions, Plaintiffs have suffered the loss of Renesas confidential trade secret information, compromising their competitive advantage and proprietary knowledge.

142. Defendants' actions have resulted in the potential loss of goodwill for Plaintiffs, potentially diminishing the trust and positive relationships they have cultivated over many decades with their customers and business partners.

143. Defendants' unauthorized actions may cause further harm to Plaintiffs' reputations, affecting their standing and credibility within the industry.

144. As a result of Defendants' actions, Plaintiffs may lose prospective advantageous relationships with employees, clients, and customers.

145. As a direct and proximate cause of Defendants' misappropriation of Renesas's trade secrets, Defendants have been unjustly enriched, and Plaintiffs have sustained damages in an amount to be proven at trial. Plaintiffs have also suffered irreparable harm as a result of Defendants' activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants, and all other persons acting in concert with them, are enjoined from engaging in any further such acts of misappropriation.

146. Defendants committed the acts alleged herein maliciously, fraudulently, and with the wrongful intention of injuring Plaintiffs' business and benefiting themselves. Defendants acted with an improper motive amounting to malice and a conscious disregard of Plaintiffs'

rights. Accordingly, pursuant to 18 U.S.C. § 1836(b)(3)(C), Plaintiffs are entitled to recover exemplary damages in an amount equal to twice the award of damages.

147.    As a result of Defendants' acts as described herein, and which, were undertaken in bad faith, and willfully and maliciously, Plaintiffs have incurred and will continue to incur substantial attorneys' fees in connection with this matter. Pursuant to 18 U.S.C. § 1836(b)(3)(D), Plaintiffs are entitled to an award of reasonable attorneys' fees in this action.

**COUNT TWO**
**<u>Breach of Contract</u>**
**(Against Allexandre)**

148.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

149.    REA and Allexandre entered into four different valid contracts supported by consideration: (1) the Allexandre Employment Agreement, (2) the Allexandre Confidentiality Agreement, (3) the Separation Agreement, and (4) the Final Release.

150.    REA performed its obligations under each contract, including but not limited to by paying Allexandre a salary and severance package, or was excused from performance of certain obligations by reasons of Allexandre's breaches.

151.    While Allexandre's obligations were in full force and effect, Allexandre breached each of these agreements.

152.    Allexandre breached at least Sections 11 and 12 of the Allexandre Employment Agreement by misappropriating Renesas's confidential information and trade secrets, including as contained within the two PowerPoint presentations Allexandre took, (§11), and soliciting or attempting to solicit REA employees Davin Lee and Scott Martin to leave Navitas prior to Allexandre's departure (§12).

153.    Allexandre breached at least Sections 3, 5, and 6 of the Allexandre Confidentiality Agreement by misappropriating Renesas's information confidential (§ 3), assisting Renesas competitors such as Navitas during his employment at Renesas (§ 5), and soliciting REA employees to join Navitas during his employment at Renesas and for one year thereafter (§ 6).

154.    Allexandre breached at least Sections 2, 8, and 17 of the Separation Agreement by

- 28 -

misappropriating Renesas's confidential information and trade secrets, soliciting employees for Renesas's competitor Navitas, and by violating his duty of good faith to do all things necessary to effectuate the Separation Agreement.

155.    Allexandre breached at least Section 2 of the Final Release by not returning the numerous files taken via USB including the two confidential Renesas PowerPoints, i.e. company property, which were in his possession when he left Renesas.

156.    As a direct and proximate result of Allexandre's breaches, the security and confidentiality of Renesas's confidential information and trade secrets have been compromised, and REA employees have been raided, causing Plaintiffs to suffer damages in an amount to be determined at trial. Under Section 10 of the Separation Agreement, REA is further entitled to all payments made under the Separation Agreement in addition to the foregoing amounts.

**COUNT THREE**
**Conversion**
**(Against Allexandre)**

157.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

158.    At all relevant times, Plaintiffs hereby exclusively owned—and still exclusively own—property taken by Allexandre, including but not limited to the referenced PowerPoint presentations.

159.    Allexandre intentionally and substantially interfered with Plaintiffs' property by taking possession of said property without Plaintiffs' consent.

160.    As a direct and proximate cause of Allexandre's taking of Plaintiffs' property, Allexandre, and, on information and belief, Navitas have been unjustly enriched and Plaintiffs have sustained damages in an amount to be proven at trial. Plaintiffs have also suffered irreparable harm as a result of Allexandre's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Allexandre, and all other persons acting in concert with Allexandre, are enjoined from engaging in any further such acts of conversion.

161.    Each of the acts of conversion was done willfully and maliciously by Allexandre, thereby entitling Plaintiffs to exemplary damages to be proved at trial.

- 29 -

**COUNT FOUR**
**Conversion**
**(Against Cheng)**

162.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

163.    At all relevant times, Plaintiffs hereby exclusively owned—and still exclusively own—property taken by Cheng, including but not limited to the referenced PowerPoint presentations and emails.

164.    Cheng intentionally and substantially interfered with Plaintiffs' property by taking possession of said property without Plaintiffs' consent.

165.    As a direct and proximate cause of Allexandre and Cheng's taking of Plaintiffs' property, Cheng and, on information and belief, Navitas have been unjustly enriched and Plaintiffs have sustained damages in an amount to be proven at trial. Plaintiffs have also suffered irreparable harm as a result of Cheng's activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Cheng, and all other persons acting in concert with Cheng, are enjoined from engaging in any further such acts of conversion.

166.    Each of the acts of conversion was done willfully and maliciously by Cheng, thereby entitling Plaintiffs to exemplary damages to be proved at trial.

**COUNT FIVE**
**Commission of Computer Crimes, Violation of California Penal Code § 502(c)**
**(Against Allexandre)**

167.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

168.    Plaintiffs are the owners of computer systems and computer networks on which they maintain confidential data and software, including confidential information.

169.    Allexandre was bound by his agreements with REA, *see supra* ¶¶ 55-58, 68-74, and REA's policies, *see supra* ¶¶ 115-120, 126, 128, not to remove unencrypted, computer-readable confidential information from REA's offices and to return all confidential information upon the end of his employment with REA.

170.    Allexandre knowingly accessed Renesas's confidential information and without

- 30 -

COMPLAINT

permission took or downloaded data from Plaintiffs' computer systems and computer networks, in violation of Cal. Penal Code § 503(c)(2).

171. Allexandre's knowing conduct in downloading and emailing Renesas's confidential materials and failing to return such information at the end of his employment with Renesas was not within the scope of his lawful employment, as it was not reasonably necessary to the performance of any work assignment.

172. Plaintiffs have suffered damage or loss by reason of Allexandre's violation(s) of Cal. Penal Code § 502(c)(2), including expenditures incurred to verify that Renesas's confidential information was not altered, damaged, or deleted by Allexandre's access and to determine the extent of his copying.

173. Plaintiffs are entitled to compensatory damages in an amount to be proven at trial pursuant to Cal. Penal Code § 502(e)(1).

174. Plaintiffs are further entitled to injunctive and equitable relief as set forth below pursuant to Cal. Penal Code § 502(e)(1).

175. Plaintiffs are further entitled to their reasonable attorney's fees pursuant to Cal. Penal Code § 502(e)(2).

## COUNT SIX
### Commission of Computer Crimes, Violation of California Penal Code § 502(c)
#### (Against Cheng)

176. Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

177. Plaintiffs are the owners of computer systems and computer networks on which they maintain confidential data and software, including confidential information.

178. Cheng was bound by REA's policies (*see supra* ¶¶ 115-120, 126, 128) including the Renesas Global Code of Business Conduct, which Cheng acknowledged that she had received, read, understood, and agreed to comply with on April 20, 2023 (*see supra* ¶¶ 93-95) not to remove unencrypted, computer-readable confidential information from REA's offices and to return all confidential information upon the end of her employment with REA.

179. Cheng knowingly accessed Renesas's confidential information and without

- 31 -

permission took or downloaded data from Plaintiffs' computer systems and computer networks, in violation of Cal. Penal Code § 503(c)(2).

180. Cheng's knowing conduct in downloading and emailing Renesas's confidential materials and failing to return such information at the end of her employment with REA was not within the scope of her lawful employment, as it was not reasonably necessary to the performance of any work assignment.

181. Plaintiffs have suffered damage or loss by reason of Cheng's violation(s) of Cal. Penal Code § 502(c)(2), including expenditures incurred to verify that Renesas's confidential information was not altered, damaged, or deleted by Cheng's access and to determine the extent of her copying.

182. Plaintiffs are entitled to compensatory damages in an amount to be proven at trial pursuant to Cal. Penal Code § 502(e)(1).

183. Plaintiffs are further entitled to injunctive and equitable relief as set forth below pursuant to Cal. Penal Code § 502(e)(1).

184. Plaintiffs are further entitled to their reasonable attorney's fees pursuant to Cal. Penal Code § 502(e)(2).

### COUNT SEVEN
### Unfair Competition Under California Business & Professions Code § 17200, et seq.)
### (Against All Defendants)

185. Plaintiffs incorporate the foregoing paragraphs as though fully set forth herein.

186. California Business and Professions Code Section 17200, et seq., prohibits acts of unfair competition, including any and all "unlawful, unfair or fraudulent business act or practice."

187. Defendants' actions, as described above, are unfair, unlawful, and fraudulent.

188. Plaintiffs have suffered damages because of Defendants' unfair, unlawful, and fraudulent actions.

189. Plaintiffs are further entitled to injunctive relief as set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand judgment in their favor and against all

- 32 -

Defendants and pray for relief as follows:

1.    Preliminary and permanent injunctive relief which assures that any ongoing and future misappropriation of Renesas's confidential information and trade secrets be immediately stopped on the part of Defendants, all those acting in concert with Defendants, and other appropriate persons and/or entities, irrespective of whether under the control of Defendants and such other injunctive relief that may be appropriate;

2.    Further equitable relief in the most appropriate form that will have the effect of "undoing" any past or current misappropriations of Renesas's confidential information and trade secrets on the part of Defendants, all those acting in concert with Defendants, and other appropriate persons and/or entities, irrespective of whether under the control of Defendants including but not limited to the return of Renesas's confidential and proprietary information and its trade secrets and such other injunctive relief that may be appropriate;

3.    Compensatory damages, past and future, in an amount adequate to compensate Plaintiffs;

4.    General damages;

5.    An accounting to establish, and an order requiring restitution and/or disgorgement of, the sums by which Defendants have been unjustly enriched;

6.    All payments made under the Separation Agreement.

7.    A reasonable royalty for Defendants' misappropriation of Renesas's trade secrets;

8.    Exemplary and punitive damages as authorized by law;

9.    Attorneys' fees and costs incurred in connection with this matter;

10.    Prejudgment and post-judgment interest at the maximum rate allowed by law and costs of court; and

11.    Such other relief as the Court may deem just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs Renesas Electronics Corporation and Renesas Electronics America Inc. demand a trial by jury on all issues.

Dated:  July 22, 2026

/s/ Robert S. Shwarts
Robert S. Shwarts (SBN 196803)
Krishna Shah (SBN 336531)
ORRICK, HERRINGTON & SUTCLIFFE LLP

*Attorneys for Plaintiffs Renesas Electronics*
*Corporation and Renesas Electronics America*
*Inc.*

- 34 -